GLENN SOLOMON (SBN 155674)
gsolomon@kslaw.com
ARWEN R. JOHNSON (SBN 247583)
arwen.johnson@kslaw.com
RAMON A. MIYAR (SBN 284990)
rmiyar@kslaw.com
JASON DON A. DE JESUS (SBN 311684)
jdejesus@kslaw.com
**KING & SPALDING LLP**
633 West Fifth Street
Suite 1600
Los Angeles, CA 90071
Telephone:  +1 213 443 4355
Facsimile:   +1 213 443 4310

ROBERT M. COOPER (*pro hac vice* application forthcoming)
rcooper@kslaw.com
**KING & SPALDING LLP**
1700 Pennsylvania Ave. N.W.
Suite 900
Washington, D.C. 20006
Telephone:  +1 202 737 0500
Facsimile:   +1 202 626 3737

Attorneys for Plaintiffs EMANATE HEALTH;
EMANATE HEALTH IPA; EMANATE HEALTH
MEDICAL GROUP; EMANATE HEALTH FOOTHILL
PRESBYTERIAN HOSPITAL; EMANATE HEALTH
MEDICAL CENTER d/b/a EMANATE HEALTH
QUEEN OF THE VALLEY HOSPITAL and d/b/a
EMANATE HEALTH INTER-COMMUNITY
HOSPITAL

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| EMANATE HEALTH, a California non-profit public benefit corporation; EMANATE HEALTH IPA, a California professional corporation; EMANATE HEALTH MEDICAL GROUP, a California professional corporation; EMANATE HEALTH FOOTHILL PRESBYTERIAN HOSPITAL, a California non-profit public benefit corporation; EMANATE | Case No. 2:23-cv-09872 <br><br> **COMPLAINT** <br><br> Judge: TBD |

HEALTH MEDICAL CENTER d/b/a
EMANATE HEALTH QUEEN OF
THE VALLEY HOSPITAL and d/b/a
EMANATE HEALTH INTER-
COMMUNITY HOSPITAL, a
California non-profit public benefit
corporation;

        Plaintiffs,

    v.

OPTUM HEALTH, a California
corporation; OPTUM HEALTH PLAN
OF CALIFORNIA, a Delaware
corporation; OPTUMCARE
HOLDINGS, LLC, a California limited
liability company; OPTUMCARE
MANAGEMENT, LLC, a California
limited liability company;
HEALTHCARE PARTNERS
AFFILIATES MEDICAL GROUP, a
general partnership,

        Defendants.

## INTRODUCTION

1.     This lawsuit arises out of serious unlawful and fraudulent practices by Defendants directed at harming Plaintiffs, as well as doctors formerly employed by or contracted with Defendants, and the patients of those doctors. As described more fully below, Defendants have engaged in a concerted effort to prevent patients from contacting their doctors who chose to leave Defendants to join competing medical groups, by lying to the patients who called asking where their doctors had gone, and instructing Defendants' remaining personnel not to reveal to patients where the departed doctors could be found. Likewise, Defendants have wrongfully sought to intimidate their doctors who want to leave Defendants from exercising the doctors' statutory rights under California law to go to competing medical groups, using facially unlawful restrictions in the physicians' contracts,

1   and threatening the physicians and competitors with legal action if the doctors
2   move to Defendants' competitors.

3       2.    Plaintiffs seek relief against Defendants to prevent any further harm to
4   Plaintiffs, the doctors, or the patients.  Otherwise, patients who want to remain
5   with their physicians will continue to be impeded from doing so, and doctors who
6   want to exercise their statutory right to go to competitors will be prevented from
7   doing so, which federal and California law preclude.  The relief sought includes
8   injunctive relief, declaratory relief, damages, applicable penalties, fees, and costs.

9   **PLAINTIFFS**

10       3.    Plaintiff Emanate Health, a provider of healthcare services, is a non-
11   profit public benefit corporation organized under the laws of the state of California,
12   with its principal place of business located at 140 West College Street, Covina, CA
13   91723.

14       4.    Plaintiff Emanate Health IPA ("EHIPA") is a professional corporation
15   organized under the laws of the State of California with its principal place of
16   business at 1041 West Badillo Street, Suite 104, Covina, California 91722.  It is a
17   physician-owned independent physician association that contracts with physicians
18   and provides healthcare services. EHIPA physicians often choose to use Emanate
19   Health for their patients.  EHIPA is not owned by Emanate Health.

20       5.    Plaintiff Emanate Health Medical Group ("EHMG") is a corporation
21   organized under the laws of the State of California, with its principal place of
22   business located at 1041 West Badillo Street, Suite 102, Covina, California 91722.
23   EHMG is a physician-owned independent professional corporation that employs
24   and contracts with physicians and provides healthcare services.  EHMG physicians
25   often choose to use Emanate Health for their patients.  EHMG is not owned by
26   Emanate Health.

27       6.    Plaintiff Emanate Health Medical Center ("EHMC") is a California
28   non-profit public benefit corporation with its principal place of business located at

3

210 W. San Bernardino Road, Covina, California 91723.  EHMC operates two hospitals, one doing business as Emanate Health Queen of the Valley Hospital ("Queen of the Valley") at 1115 S. Sunset Ave., West Covina, California 91790, and the other doing business as Emanate Health Inter-Community Hospital ("Inter-Community") at 210 W. San Bernardino Road, Covina, California 91723.

7.     Plaintiff Emanate Health Foothill Presbyterian Hospital ("Foothill Presbyterian") is a California non-profit public benefit corporation with its principal place of business located at 250 South Grand Avenue, Glendora, California 91741.

## DEFENDANTS

8.     On information and belief, Defendant Optum Health is a corporation organized under the laws of the State of California, with its principal place of business located at 435 Arden Avenue #560, Glendale, CA 91203.

9.     On information and belief, Defendant Optum Health Plan of California ("OHPC") is a corporation organized under the laws of the State of Delaware, and a California-licensed Knox-Keene health plan.

10.     On information and belief, Defendant OptumCare Holdings, LLC ("OptumCare Holdings") is a limited liability company organized under the laws of the State of California, with its principal place of business located at 11000 Optum Circle, Eden Prairie, MN 55344.

11.     On information and belief, Defendant OptumCare Management, LLC ("OptumCare Management") is a limited liability company organized under the laws of the state of California, with its principal business address located at 2175 Park Place, El Segundo, CA 90245.

12.     On information and belief, Defendant Healthcare Partners Affiliates Medical Group ("HCPAMG") is a general partnership with a principal place of business in El Segundo, California.

13.     On information and belief, Defendants are all affiliates, either directly

4

1   or indirectly, of one another, and/or of another commonly owned entity or entities.

2   14.   On information and belief, Defendants do business under the single

3   umbrella trade name of "Optum," along with other affiliates that are branded

4   "Optum," which combined are reported to be the single largest employer of

5   physicians in the United States, with more than 70,000 directly employed or

6   aligned physicians.  The combined Optum entities have at least 2,200 primary and

7   specialty care offices in 16 states.  Moreover, Optum's website reports having over

8   100 primary care physicians ("PCPs") in the municipalities of Covina, West

9   Covina, Glendora, Azusa, and San Dimas, California.

10   15.   The manner in which Defendants run their business and same trade

11   name of "Optum" obscures which of Defendant(s) played what role in the

12   misconduct detailed in this lawsuit.  Therefore, Defendants' manner of operating

13   together has forced Plaintiffs to sue all these Defendants individually and

14   collectively at this time.  Plaintiffs reserve the right to amend the Complaint to add

15   or remove Defendants as additional information becomes available through

16   discovery about which of the Optum branded entities performed which violations

17   of law, as well as to name as additional defendants any specific individuals who

18   are shown to have been responsible for these violations.

19   <u>**JURISDICTION AND VENUE**</u>

20   16.   This Court has original subject matter jurisdiction over this action

21   under 28 U.S.C. § 1331 insofar as there are claims alleged herein that arise under

22   Constitution, laws, or treaties of the United States.  To the extent this Complaint

23   asserts causes of action under state law, this Court may lawfully exercise

24   supplemental jurisdiction pursuant to 28 U.S.C. § 1367.

25   17.   This Court has personal jurisdiction over Defendants Optum Health,

26   OptumCare Holdings, OptumCare Management, and HPAMG because each is

27   domiciled in the State of California and their wrongful acts alleged herein were

28   committed within California, or if not committed within California, purposefully

COMPLAINT                                                                Case No. 2:23-cv-09872

directed at Plaintiffs in California.

18.     This Court has personal jurisdiction over Defendant OHPC because OHPC's wrongful acts alleged herein were committed within California, or if not committed within California, were purposefully directed at Plaintiffs in California.

19.     Venue is properly laid in this Court pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to the claims asserted in this action occurred in Los Angeles County, California.  Additionally, on information and belief, the principal places of business of Defendants OptumCare Management, Optum Health, and HPAMG are Los Angeles County, California.

## **FACTUAL ALLEGATIONS**

20.     Plaintiff Emanate Health is well-respected non-profit healthcare provider that primarily serves patients in and around the East San Gabriel Valley region of the San Gabriel Valley serving a community of more than 1 million people.  Emanate Health provides leading care through its three hospitals, Inter-Community, Queen of the Valley, Foothill Presbyterian.  Emanate Health also provides home health care services and manages sixteen ambulatory sites throughout the region that provide primary and specialty care to the community. Emanate Health's brand of technologically advanced, comprehensive health care service is made possible through the combined effort of its talented employees, affiliated physicians, volunteers, and donors.

21.     Emanate Health's core mission is to provide affordable healthcare services to patients in the community that it serves.  It does this in several ways, including without limitation, working with its affiliates to maintain a network of hospitals and clinics, and associating with PCPs and specialists to provide services at those hospitals and clinics.  Its three hospitals are well-respected community resources:

a.     Queen of the Valley is a 325-bed fully accredited non-profit,

COMPLAINT                                                      Case No. 2:23-cv-09872

health care facility in West Covina, CA.  This campus is known regionally for its family-centered maternity services and critical newborn care.  It also is home to a da Vinci surgical robot and has one of the busiest emergency rooms in Los Angeles County.

b.      Inter-Community is a 193-bed facility providing a wide range of medical, surgical and specialty care services, including inpatient and outpatient services, and specializing in cardiac care, with open heart surgery, electrophysiology (mapping of the heart), cardiopulmonary, rehabilitation, a Cardiac Cath Lab that provides the latest treatments and advancements for patients suffering from heart disease, and a designated STEMI Receiving center for heart attack patients.

c.      Foothill Presbyterian has 105 accredited beds, and serves the communities of Glendora, Azusa, San Dimas, and La Verne.  It offers a unique blend of general acute care and specialty services, including 24-hour emergency care, an Outpatient Diabetes Education Program recognized by the American Diabetes Association as a Center of Excellence for diabetes education, mammography and radiology services, as well as many support and community outreach programs.

22.    Plaintiff EHIPA is a physician-owned independent physician association whose physicians provide medical services at Emanate Health-affiliated hospitals and primary-care and specialty clinics primarily in Covina, West Covina, San Dimas, and Glendora, California.

23.    Plaintiff EHMG is an independent, physician-owned professional corporation that directly employs physicians who treat patients at Emanate Health-affiliated hospitals and clinics in Covina, West Covina, San Dimas, and Glendora, California.

COMPLAINT                                            Case No. 2:23-cv-09872

**<u>Defendants Misrepresent to Patients the Location of Doctors Who Have Left</u>**
**<u>Defendants to Join EHMG and Discipline Employees Who Disclose to Patients</u>**
**<u>the Whereabouts of Those Doctors</u>**

24.    In or around 2017, OptumCare Management acquired the medical practice formerly known as Magan Medical Clinic ("Magan"), located at 420 W Rowland St, Covina, California, 91723.  Following the acquisition, the former Magan practice became branded "Optum – Covina" to join Defendants' Optum-branded business.

25.    In and after December 2022, several Optum-Covina physicians (who were formerly part of Magan)—mostly PCPs who generally did not see patients at any Emanate Health-affiliated hospital under the HSAs—voluntarily left to join EHMG.  These doctors independently contacted and applied to join EHMG, pursuant to publicly advertised positions (collectively, "Former Optum Providers").

26.    After the first of the Former Optum Providers left Defendants to join EHMG, Defendants transferred their patients to other physicians then with Defendants, without informing the patients of their treating physicians' departure or asking the patients who they wanted to be their physicians.  Thereafter, some of the Optum-Covina physicians to whom Defendants initially transferred the patients also applied for positions at and were hired by EHMG, resulting in yet another transfer of the patients to other physicians of Defendants, once again with no notice to or input from the patients in question.

27.    On information and belief, Defendants deliberately omitted to notify patients that the Former Optum Providers were leaving Defendants, and purposefully scheduled follow-up appointments to occur after the Former Optum Providers left, so that the Former Optum Providers could not inform their patients that they were leaving Defendants to join EHMG.

28.    On information and belief, Defendants' administrators, acting at the

COMPLAINT                                                          Case No. 2:23-cv-09872

direction of higher-level corporate officials at Defendants, directed the remaining physicians, medical assistants, and other administrative staff affiliated with Defendants at Optum-Covina to refrain from disclosing to patients of the Former Optum Providers that these patients' physicians had left Optum and relocated to EHMG. Defendants threatened to discipline any physician or other employee who disclosed to patients that one or more of the Former Optum Providers had relocated to EHMG.

29. Based on information and belief, Defendants disciplined one or more employees for truthfully responding to inquiries from one or more patients of a Former Optum Provider as to (a) why the patient was no longer being treated or seen by the Former Optum Provider at their appointment, and (b) where the Former Optum Provider had moved. In at least one instance, on information and belief, the disciplinary action by Defendants included the termination of an employee for truthfully responding to a patient inquiry regarding the status and whereabouts of one of the Former Optum Providers.

30. Some of Defendants' physicians were given copies of their contract with Defendants containing unlawful restrictions on competition and told that Defendants would consider the physicians to have breached if they informed patients that any of the Former Optum Providers had joined EHMG.

31. In at least one instance, in response to a patient inquiry about the whereabouts of Dr. Wanda Brady—an OBGYN who had left Defendants to join EHMG— one of Defendants' staff, acting at the direction of Defendants' managing agents, intentionally and falsely misrepresented to that patient that Dr. Brady had retired.

32. In response to inquiries about Dr. Vahid Javaherian, another physician who had left Defendants for EHMG, Defendants falsely responded to the patient inquiry that Dr. Javaherian was on vacation, not that he had left.

33. Upon information and belief, many of the patients from whom

9

1    Defendants withheld information about the Former Optum Providers had been

2    treated by one or more Former Optum Providers for many years.  Upon

3    information and belief, at least some of these patients were seniors who now have

4    dementia, and thus, would be profoundly agitated and confused by not being able

5    to find their physician of choice, and not being able to get information from

6    Defendants about their preferred physician's status of whereabouts.  These

7    foregoing practices by Defendants of withholding information about, or downright

8    misrepresenting the status of the Former Optum Providers, constitute a profound

9    interference with the patients' right to choose their doctors, and the existing

10   physician-patient relationships that the patients had with the Former Optum

11   Providers.

12        34.    It is one thing if a patient is given the information needed to

13   knowingly choose who will be his or her physician when the doctor changes

14   employers.  It is quite another for Defendants to lie to patients and deliberately

15   conceal the circumstances and whereabouts of the patients' established physicians.

16   **<u>Optum Falsely and Intentionally Misrepresented that the Former Optum</u>**

17   **<u>Providers and Employees Were Unhappy in their New Employment in an</u>**

18   **<u>Unlawful Effort to Deter Other Defendant Employees from Applying to Work</u>**

19   **<u>for Plaintiffs</u>**

20        35.    Plaintiffs further allege, based on information and belief, that the

21   Director of Group Operations at Optum – Covina, Crystelle Patino, acting at the

22   direction of managing agents, officers, and/or other corporate officials of the

23   Defendants, falsely and intentionally misrepresented to Defendants' physicians and

24   employees at the Optum-Covina location, that one or more former employees who

25   accepted employment at Plaintiffs said the former employees were unhappy

26   working for Plaintiffs, and begged to return to their former position(s) at

27   Defendants.  Based on information and belief, in making these false

28   misrepresentations, it was Defendants' intent to deter its remaining employees

COMPLAINT                                        Case No. 2:23-cv-09872

from exercising the employees' right to apply for jobs at Plaintiffs, or to the extent they already were actively applying, to disrupt or cause the employees to cancel the pending application process.

**Optum Has a Dominant Market Share Among Medicare Advantage HMO and Commercial HMO Members in the Geographies in Which Plaintiffs' Patients Reside**

36.    The Department of Managed Health Care ("DMHC") website reflects that, as of 2018, OHPC had 121,382 members in its Medicare Advantage HMO plans in Los Angeles County and 311,771 members in its Commercial HMO plans in Los Angeles County.  On information and belief, OHPC's share of total Medicare Advantage HMO members and Commercial HMO members in Los Angeles County remains similarly large.

37.    OHPC is a managed care organization, and as such, can direct and steer its members to or away from a particular facility for treatment.

38.    On information and belief, OHPC's market share in Medicare Advantage HMO and Commercial HMO enrollees is close to, or exceeds, fifty percent (50%) in the geographies in which Plaintiffs' patients reside.  For example, in 2021, Optum-affiliated members represented over sixty-two percent (specifically 62.6%) of discharges from Emanate Health-affiliated hospitals for Medicare Advantage HMO patients, and over forty-five percent (specifically 45.7%) of discharges from Emanate Health-affiliated hospitals for Commercial HMO patients.  On information and belief, these figures continue to be representative of OHPC's market share in the geographies in which Plaintiffs' patients reside.

**Optum Engages in Anticompetitive Acts in an Attempt to Monopolize the Market for PCPs in the Geographies in Which Plaintiffs' Patients Reside**

39.    In or around 2021, Defendants commenced a pattern of unfair competitive conduct to exert monopolistic power over the market for PCPs in the

COMPLAINT                                              Case No. 2:23-cv-09872

geographies in which Plaintiffs' patients reside.  Specifically, Defendants threatened cancellation of the HSAs with Foothill Presbyterian and Queen of the Valley, unless Plaintiffs agreed to new, coercive, anti-competitive terms, calculated to ensure its exit from the medical group business, so that Defendants could secure market dominance over PCPs in the geographies in which Plaintiffs' patients reside.

40.    On or around June 30, 2021, during a dinner meeting between Emanate Health and Defendants' executives, including Victor Wong, M.D., Jung Lee, and Derek Chao, M.D. in Arcadia, Defendants' executives communicated to Emanate Health's CEO and others present that (1) Defendants considered the physician business to be Defendants' "domain," (2) Defendants viewed Emanate Health's business to be restricted to the hospitals and Emanate Health should "stay in its lane"; (3) Defendants would not encroach on the hospital business if Emanate Health did not encroach on Defendants' physician business; (4) Emanate Health's establishment of businesses involving physicians placed unwanted competitive pressure on Defendants; and (5) when EHMG or EHIPA vie for physicians in competition with Defendants, it impedes Defendants' ability to hire and keep physicians by driving up what Defendants pay to employ and contract with physicians.

41.    When Emanate Health did not agree to Defendants' demand to stay out of the physician business, in three letters dated December 1, 2021, Matthew Butler, Director of National Contracting for Defendants communicated to Emanate Health that if "renegotiation" of the HSAs was unsuccessful—i.e., if Emanate Health did not agree to its coercive and anti-competitive terms—then OHPC would terminate the HSAs with (1) Queen of the Valley; (2) Emanate Health Inter-Community Hospital; and (3) Foothill Presbyterian.  The December 1, 2021 letters indicated that they would serve as 180 days' notice of termination of the HSAs without cause, effective May 31, 2022.

42. Then, during a follow-up meeting on or around December 17, 2021 in the board room of Inter-Community in Covina, California, Defendants' representatives Jung Lee, Preedar Oreggio, M.D., and Victor Wong, M.D. again pressured Emanate Health to exit the physician business and dismantle EHMG and EHIPA. Specifically, Defendants' executives reiterated that Emanate Health should not be in the business of building medical groups to provide physician services to Medicare Advantage HMO and Commercial HMO members, which Defendants considered their exclusive domain.

43. On or around February 1, 2022, Defendants provided proposed terms for an amended contract between OHPC, on the one hand, and Foothill Presbyterian and Queen of the Valley, on the other hand, as well as terms for a contract with Inter-Community. This proposal contained a series of unfair, anti-competitive provisions. Defendants sought to force these provisions on Emanate Health by threatening cancellation of (and ultimately actually cancelling) the HSAs, which in turn would deprive Plaintiffs of Medicare Advantage HMO patients and Commercial HMO patients enrolled with OHPC. By way of example, the proposal included the following non-exhaustive terms:

a. The proposal provided that "Emanate's PCPs will be fully exclusive under Optum's IPA for both Medicare Advantage and Commercial HMO business."

b. The proposal further provided that "OHPC shall own right of first refusal and right of last refusal in the event that Emanate puts any of its PCP assets up for sale."

c. It also included an illegal and unenforceable non-solicitation clause, providing that "Emanate shall not solicit any of OHPC IPA's participating providers. Should any physician affiliated with OHPC wish to sell their practice, OHPC shall maintain first privilege to purchase."

44. The pricing proposed also included a 30-percent reduction in rates for

13

1  emergency and outpatient services relative to the existing HSAs, despite the well-

2  publicized fact that inflation was at historic highs, making drastic rate reductions

3  untenable.  But Defendants indicated both before and afterward that the rates were

4  negotiable, so long as the above-stated restrictions were accepted by Plaintiffs.

5      45.     In the cover email attaching the proposal, Matthew Butler, Director of

6  National Contracting for Defendants, summarized the terms as follows:

7  Attached is the terms and rates proposal document for your review.  Some of the highlights of the proposal include:

8  - The term span proposal for the hospital contracts is for 4 years (June 1, 2022 through May 31, 2026)
   - The term span proposal for the physician group contract is for 10 years (June 1, 2022 to May 31, 2032)

9  - OHPC is proposing Commercial HMO inpatient rates in leu of the current workflow of utilizing the enrollees primary health plan's contracted inpatient rates.

10 - OHPC is strongly requesting that Emanate employed PCPs be exclusive to OHPC for the MA and Commercial HMO products.

11 - OHPC is strongly requesting that Emanate will not solicit any currently contracted OHPC IPA physician to join their Employed Physician Foundation or Medical Group.

12 - OHPC is requesting to have first and last refusal rights if Emanate puts any of its PCP assets up for sale.
   - OHPC is requesting that inner Emanate campus patient transfer costs not be billed separately.

13     46.     On or around April 7, 2022, Defendants sent another proposal for

14 renewal of the HSAs, which included the same anticompetitive exclusivity, non-

15 solicitation, and right-of-first refusal clauses as the first proposal.  As to proposed

16 rates, however, the new proposal amounted to only a 12-percent rate reduction, as

17 opposed to the prior proposed 30-percent rate reduction.  This reflects again that

18 rates were negotiable, so long as Plaintiffs accepted the non-negotiable

19 anticompetitive restrictions.

20     47.     On May 5, 2022, Emanate Health executives met with Defendants'

21 Senior Vice President of Operations, Sam Bajaj; Defendants' Senior Vice

22 President of Hospital Contracting, Abdul Kassir; and Matt Butler to discuss

23 Defendants' second proposal.  During this meeting, Mr. Bajaj once again raised the

24 issue of Emanate Health's affiliated physician groups, EHMG and EHIPA, and

25 said that Plaintiffs' exit from the physician space was an issue of paramount

26 importance for Defendants.  Defendants also refused to consider any

27 counterproposal unless Plaintiffs agreed that EHMG and EHIPA effectively cease

28 competing with Defendants for physicians.

48.     When Plaintiffs refused to agree to Defendants' anti-competitive unlawful terms, Defendants followed through on the threat to take punitive action, and terminated the HSAs with EHMC for Queen of the Valley and Foothill Presbyterian, effective May 31, 2022.

**Following Termination of the HSAs, Optum Began Steering OHPC Medicare Advantage HMO and Commercial HMO Members Away and Unlawfully Disrupted their Continuity of Care Rights**

49.     After terminating the HSAs when Defendants' anticompetitive demands were not met, Defendants began steering OHPC's Medicare Advantage HMO and Commercial HMO members away from Plaintiffs, to geographically remote, non-Emanate Health-affiliated facilities, such as San Dimas Community Hospital and Arcadia Methodist Hospital.  For example, a patient reported on NextDoor.com to being routed by Defendants to distant locations, even for emergency services, which Defendants never should steer for financial reasons:



50.     Both California and Medicare impose continuity of care requirements on Commercial HMO and Medicare Advantage HMOs under the California Health and Safety Code and federal regulations.  Defendants have not complied with their continuity of care obligations.   For example, Defendants called pregnant Commercial HMO patients of Emanate Health-affiliated OBGYN, Dr. Samuel Kassar, and pressured those patients to switch providers and seek pre-natal care and delivery at San Dimas Community Hospital. These patients were OHPC's Commercial HMO members, and thus Defendants violated California Health & Safety Code § 1373.96(c)(3)(A), which provides that, upon termination of a provider contract, "[a] pregnancy is the three trimesters of pregnancy and the

immediate postpartum period. Completion of covered services shall be provided for the duration of the pregnancy" at the terminated provider.

51.     As a result of Defendants' post-termination conduct, monthly admissions of OHPC's Medicare Advantage HMO members and Commercial HMO members have materially declined.  For example, scheduled surgeries and scheduled outpatient procedures by OHPC's Medicare Advantage HMO and Commercial HMO members have fallen by as much as 70-80% relative to the period during which the HSAs were in place.  In this way, Defendants used their dominant position in the geographies in which Plaintiffs' patients reside to financially punish the Plaintiffs for not agreeing to the above-described unlawful anti-competitive terms Defendants insisted on as a condition of remaining contracted.

## Prior Contracts Between Some of the Parties

52.     Some but not all Plaintiffs used to have contracts with some but not all Defendants.  The contracts between some of these parties contain blatantly illegal restrictions on trade under California law, as described below.  These illegal provisions appear to be template language used by Defendants.  Therefore, Defendants presumably use similarly illegal restrictions on trade in their contracts with their physicians.

53.     From 2016 until November 2022, Foothill Presbyterian and Queen of the Valley, were contracted to be in-network providers of hospital services for enrolled members of Commercial HMO and Medicare Advantage HMO insurance plans that delegate their members to OHPC.  The terms that governed these in-network services were set forth in (1) a Hospital Services Agreement between OHPC's predecessor (then called Davita Healthcare Partners Plan, Inc. ("DHPP") before OHPC bought it from DaVita) and Foothill Presbyterian; and (2) a Hospital Services Agreement between OHPC's predecessor and Queen of the Valley (collectively, "the HSAs").

54.     In or around June 2019, OHPC acquired DHPP. As part of that transaction, OHPC assumed DHPP's interests in the HSAs, and thereafter rebranded it with the Optum name.  On information and belief, DaVita no longer is affiliated with OHPC.

55.     Each of the HSAs contain substantially identical provisions, which purported to impose on Foothill Presbyterian, Queen of the Valley, and their affiliates, very broad-sweeping customer, provider, and employee non-solicitation/no-hire covenants.  For example, the patient/member non-solicitation clause purports to restrict Foothill Presbyterian and Queen of the Valley from soliciting OHPC members *for all time*, while a separate sweeping medical provider and employee non-solicitation clause that restricts Foothill Presbyterian, Queen of the Valley, or their affiliates from soliciting OHPC-affiliated medical providers.

56.     Section 10.4 of the Foothill Presbyterian HSA provides as follows:

10.4   <u>Solicitation and Network Interference</u>.  Hospital or Hospital Affiliates (defined below) understand and agree that the business relationships between DHPP and its Members shall be deemed the property of DHPP.  Similarly, all lists of Members accepted by Hospital or Hospital Affiliate under the provisions of this Agreement and of the Plans to which they belong shall be deemed the property of DHPP, DHPP Affiliates and/or Payors.  At no time during or after the term of this Agreement or any renewal thereof, Hospital and Hospital Affiliate agree that neither Hospital nor Hospital Affiliate or any officer, employee or agent of Hospital or Hospital Affiliate, shall, for purposes of financial gain, directly or indirectly engage in the practice of solicitation of Members without DHPP's prior written consent which may be withheld in its sole discretion.

Additionally, Hospital and Hospital Affiliate understand and agree that the business relationships between DHPP and its Participating Providers shall be deemed the property of DHPP.  Hospital and Hospital Affiliate agree that, at no time during or for two years after the term of this Agreement or any renewal thereof, neither Hospital nor Hospital Affiliate or any officer, employee or agent of Hospital and Hospital Affiliate, shall, for purposes of financial gain, directly or indirectly engage in the practice of solicitation of Participating Providers without DHPP's prior written consent which may be withheld in its sole discretion.

For purposes of this Agreement, "solicitation" shall mean any action by Hospital or Hospital Affiliate or any officer, employee or agent of Hospital or Hospital Affiliate that could be reasonably interpreted as intended to: (1) interfere with DHPP's contract and/or property rights; or (2) engage in any activity or make statements that would be likely to cause or encourage any Member, Participating Provider or Plan to discontinue their relationship with DHPP; or (3) solicit any Member to change his/her health maintenance organization, preferred provider organization, or any other similar medical payment plan or insurance company; or (4) engage in any activity or make statements that would be likely to cause or encourage any prospective Member, Participating Provider or Plan to not to establish a relationship with DHPP; or (5)

17

solicit any Member to enroll in any other medical group for the primary purpose of securing financial gain for Hospital or Hospital Affiliate; or (6) impede or otherwise interfere with negotiations which DHPP is conducting; or (7) use or disclose to any third party membership lists acquired during the term of this Agreement for the purpose of directly or indirectly soliciting individuals who were or are Members or otherwise compete with DHPP; (8) use or disclose to any third party Participating Provider lists acquired during the term of this Agreement for the purpose of directly or indirectly soliciting individuals who were or are Participating Providers or otherwise compete with DHPP; or (9) disclose proprietary DHPP information. A breach or threatened breach of this Section 10.4 during the term of this Agreement shall be grounds for termination of this Agreement.

Notwithstanding any other Section of this Agreement, in the event of a breach or threatened breach of this Section 10.4 by Hospital or Hospital Affiliate, DHPP shall have the right of specific performance and injunctive relief in addition to any and all other remedies and rights at law or in equity, including, but not limited to, punitive damages, and such rights and remedies shall be cumulative.

By execution of this Agreement, DHPP and Hospital and Hospital Affiliate agree that the restraints imposed by this Section 10.4 are reasonable as to time and scope. If at the time of enforcement of any provision of this Section 10.4, a court of competent jurisdiction or the decision of an arbitrator or arbitrators appointed in accordance with this Agreement holds that the restrictions stated in this Section 10.4 are unreasonable or unenforceable for any reason, then DHPP and Hospital and Hospital Affiliate agree that the maximum time period or scope found to be reasonable under such circumstances will be substituted for the stated period or scope.

Within the context of this Section 10.4, Hospital Affiliates shall mean (i) an entity that directly or indirectly owns or is owned by Hospital; or (ii) an entity that is directly or indirectly controlling or controlled by Hospital; or (iii) any entity which is, directly or indirectly, under common ownership or control with Hospital, or is an entity in which the entity controlling Hospital has an ownership interest; or (iv) a professional corporation that has entered into a management services agreement with Hospital or a Hospital Affiliate that satisfies (i) or (ii) above, and/or a medical group services agreement with Hospital.

57.    Section 10.4 of the Queen of the Valley HSA contains substantially identical language to the Foothill HSA non-solicitation provision, and provides as follows:

10.4   Solicitation and Network Interference.  Hospital or Hospital Affiliates (defined below) understand and agree that the business relationships between DHPP and its Members shall be deemed the property of DHPP. Similarly, all lists of Members accepted by Hospital or Hospital Affiliate under the provisions of this Agreement and of the Plans to which they belong shall be deemed the property of DHPP, DHPP Affiliates and/or Payors. At no time during or after the term of this Agreement or any renewal thereof, Hospital and Hospital Affiliate agree that neither Hospital nor Hospital Affiliate or any officer, employee or agent of Hospital or Hospital Affiliate, shall, for purposes of financial gain, directly or indirectly engage in the practice of solicitation of Members without DHPP's prior written consent which may be withheld in its sole discretion.

COMPLAINT                                          Case No. 2:23-cv-09872

Additionally, Hospital and Hospital Affiliate understand and agree that the business relationships between DHPP and its Participating Providers shall be deemed the property of DHPP. Hospital and Hospital Affiliate agree that, at no time during or for two years after the term of this Agreement or any renewal thereof, neither Hospital nor Hospital Affiliate or any officer, employee or agent of Hospital and Hospital Affiliate, shall, for purposes of financial gain, directly or indirectly engage in the practice of solicitation of Participating Providers without DHPP's prior written consent which may be withheld in its sole discretion.

For purposes of this Agreement, "solicitation" shall mean any action by Hospital or Hospital Affiliate or any officer, employee or agent of Hospital or Hospital Affiliate that could be reasonably interpreted as intended to: (1) interfere with DHPP's contract and/or property rights; or (2) engage in any activity or make statements that would be likely to cause or encourage any Member, Participating Provider or Plan to discontinue their relationship with DHPP; or (3) solicit any Member to change his/her health maintenance organization, preferred provider organization, or any other similar medical payment plan or insurance company; or (4) engage in any activity or make statements that would be likely to cause or encourage any prospective Member, Participating Provider or Plan to not to establish a relationship with DHPP; or (5) solicit any Member to enroll in any other medical group for the primary purpose of securing financial gain for Hospital or Hospital Affiliate; or (6) impede or otherwise interfere with negotiations which DHPP is conducting; or (7) use or disclose to any third party membership lists acquired during the term of this Agreement for the purpose of directly or indirectly soliciting individuals who were or are Members or otherwise compete with DHPP; (8) use or disclose to any third party Participating Provider lists acquired during the term of this Agreement for the purpose of directly or indirectly soliciting individuals who were or are Participating Providers or otherwise compete with DHPP; or (9) disclose proprietary DHPP information. A breach or threatened breach of this Section 10.4 during the term of this Agreement shall be grounds for termination of this Agreement.

Notwithstanding any other Section of this Agreement, in the event of a breach or threatened breach of this Section 10.4 by Hospital or Hospital Affiliate, DHPP shall have the right of specific performance and injunctive relief in addition to any and all other remedies and rights at law or in equity, including, but not limited to, punitive damages, and such rights and remedies shall be cumulative.

By execution of this Agreement, DHPP and Hospital and Hospital Affiliate agree that the restraints imposed by this Section 10.4 are reasonable as to time and scope. If at the time of enforcement of any provision of this Section 10.4, a court of competent jurisdiction or the decision of an arbitrator or arbitrators appointed in accordance with this Agreement holds that the restrictions stated in this Section 10.4 are unreasonable or unenforceable for any reason, then DHPP and Hospital and Hospital Affiliate agree that the maximum time period or scope found to be reasonable under such circumstances will be substituted for the stated period or scope.

Within the context of this Section 10.4, Hospital Affiliates shall mean (i) an entity that directly or indirectly owns or is owned by Hospital; or (ii) an entity that is directly or indirectly controlling or controlled by Hospital; or (iii) any entity which is, directly or indirectly, under common ownership or control with Hospital, or is an entity in which the entity controlling Hospital has an ownership interest; or (iv) a professional corporation that has entered into a management services agreement with Hospital or a Hospital Affiliate that satisfies (i) or (ii) above, and/or a medical group services agreement with Hospital.

19

58.     In or around January 2016, Healthcare Partners Affiliates Medical Group ("HPAMG"), now also an Optum affiliate, and Foothill Family Practice (a medical group that was later acquired by EHMG), entered into a Physician Agreement, under which Foothill Family Practice was to provide medical services to HPAMG plan members (the "Physician Agreement").  On or around October 1, 2016, Foothill Family Practice was acquired by EHMG f/k/a Citrus Valley Physician Partners.

59.     Section 7.3 of the Physician Agreement contains a patient and provider non-solicitation agreement substantially identical to the HSAs, which provides as follows:

7.3     Non-Solicitation and Network Interference.  HCPAMG acknowledges and values that Provider maintains clinical relationships with Members in order to fulfill its obligations under the terms of this Agreement.  Provider understands and agrees that they will be exposed to valuable confidential information of business relationships between HCPAMG and Members. Therefore, at no time during the Term and for a period of one (1) year following termination for any reason of this Agreement, Provider agrees that neither Provider nor any officer, employee, Associate Provider, or agent of Provider, shall, for purposes of financial gain, directly or indirectly engage in the practice of solicitation of Members or any employer of said Members without HCPAMG's prior written consent.

At no time during the Term and for a period of two (2) years following termination for any reason of this Agreement, Provider agrees that neither Provider nor any officer, employee, Associate Provider, or agent of Provider, shall for the purposes of financial gain, directly or indirectly engage in the practice of solicitation of Participating Providers without HCPAMG's prior written consent.

Provider further agrees that he/she will not, at any time, directly or indirectly, disparage HCPAMG or any Affiliate of HCPAMG and/or any of its agents, employees or Participating Providers. Disparaging remarks, comments or statements are those that impugn the honesty, integrity, morality or business acumen or abilities in connection with any aspect of the operation of HCPAMG's or its Affiliate's business.

For purposes of this Agreement, "solicitation" shall mean any action by Provider or any officer, employee or agent of Provider that could be reasonably interpreted as intended to persuade a Member or Participating Provider to: (1) discontinue his/her relationship with HCPAMG; or (2) disenroll from a Plan contacting with HCPAMG; or (3) encourage a Member to receive health care services from Provider on a fee-for-service basis. Nothing in this Agreement is intended to restrict the following communications and such communications shall not constitute solicitation under this Agreement: (1) Any communication between Provider and a Member reasonably determined by Provider to be necessary or appropriate for the diagnosis and care of the Member; (2) Any communication between Provider and a Member regarding changes to Provider's practice; provided that any changes to Provider's practice do not violate any other requirements in this Agreement; and (3) Any communication protected by California Business and Professions Code Section 2056.1.

A breach of this Section 7.3 during the Term shall be grounds for termination of this Agreement. Notwithstanding any other section of this Agreement, in the event of a breach of this Section 7.3 by Provider, HCPAMG shall have the right of specific performance and injunctive relief in addition to any and all other remedies and rights at law or in equity, including, but not limited to, punitive damages, and such rights and remedies shall be cumulative.

By execution of this Agreement, HCPAMG and Provider agree that the restraints imposed by this Section 7.3 are reasonable as to time and scope. If at the time of enforcement of any provision of this Section 7.3, a court of competent jurisdiction or the decision of an arbitrator or arbitrators appointed in accordance with this Agreement holds that the restrictions stated in this Section 7.3 are unreasonable or unenforceable for any reason, then HCPAMG and Provider agree that the maximum time period or scope found to be reasonable under such circumstances will be substituted for the stated period or scope.

60. Section 14.3 of the Foothill Presbyterian HSA and Queen of the Valley HSA, and Section 11.3 of the Physician Agreement, specify that they are governed by California law.

61. Section 10.4 of the Foothill Presbyterian HSA and Queen of the Valley HSA, and Section 7.3 of the Physician Agreement are blatant unlawful restraints on trade and are void and unenforceable under California Business & Professions Code section 16600, among other laws.

**Defendants Have Unlawfully Sought to Contractually Restrain Employees from Seeking Employment with Plaintiffs**

62. Upon information and belief, Defendants' contracts with their PCPs include unlawfully broad post-employment non-competition and non-solicitation covenants, which restrain them from working for competing provider networks or health systems, and from seeking to offer to render services to Defendants' members. These post-employment restrictive covenants are void and unenforceable under California Business & Professions Code § 16600.

**THE RELEVANT MARKET**

63. The relevant product market for purposes of Defendants' conduct is the market in which PCPs provide PCP services to private insurers' members and their dependents (the "PCP Market").

64. Medicare Advantage HMO and Commercial HMO members are

1    especially important revenue sources to healthcare providers because of the

2    comparative rate advantage as compared with government payors.  The ability to

3    serve these members allows healthcare providers to expand access the healthcare in

4    the communities they serve.

5        65.    The relevant geographic market for purposes of Defendants' conduct,

6    as described herein, is the various geographies in which the patients served by

7    Plaintiffs reside.  This includes, at minimum, the East San Gabriel Valley region,

8    including the municipalities of Covina, West Covian, Glendora, Azusa, and San

9    Dimas, California, as well as other areas and municipalities from which Plaintiffs'

10   patients travel.

11       66.    With respect to the PCP Market, Defendants face limited competition

12   in the relevant geographic market.

13       67.    Within the relevant geographic market, OHPC members represent

14   45-62% of Medicare HMO and Commercial discharges for Emanate Health-

15   affiliated hospitals.  This is an accurate proxy for Defendants' share of the PCP

16   Market because, in order to receive non-emergency services from Emanate Health-

17   affiliated hospitals, OHPC members must be referred to Emanate Health-affiliated

18   facilities by OHPC-affiliated PCPs, or otherwise authorized by OHPC.

19       68.    Defendants' conduct, as described herein, substantially affects

20   interstate commerce. Defendants are part of a national enterprise and are the largest

21   employer of physicians in the United States, with annual revenues of $182.8

22   billion.  It is part of the UnitedHealth Group, which ranks No. 5 in the Fortune 500.

23       69.    The anti-competitive acts of Defendants and their attempt to secure a

24   monopoly over the PCP Market in the relevant geographic market has adversely

25   impacted Plaintiffs and their affiliated hospitals, causing a decline in revenue from

26   out-of-state sources (including out-of-state payors and the federal government), as

27   well as impacting their purchases of supplies, medicines, and equipment from out-

28   of-state sources.  If Defendants succeed in monopolizing the PCP Market in the

COMPLAINT                                    Case No. 2:23-cv-09872

relevant geographic market, then these interstate effects will be exacerbated.

**ANTI-COMPETITIVE EFFECTS**

70.     Defendants acted with the purpose and effect of unreasonably injuring competition in the PCP Market in the geographies served by Plaintiffs (jointly, the "Relevant Market").

71.     But for the conduct described herein: (1) Defendant' market power in the Relevant Market would be reduced; (2) there would be a freer, more competitive marketplace for PCPs, increasing patient choice and available care options to patients in the various geographies in which the patients served by Plaintiffs reside; (3) Defendants would be unable to condition patient referrals from its insurance plans upon physician/provider exclusivity arrangements; (4) there would be increased competition between physician groups for patients, exerting downward pressure on the rates charged to patients; and (5) the aggregate cost of medical care would be lower because the Relevant Market would not be subject to Defendants' anticompetitive practices.

72.     If Defendants were to secure complete control of the PCP Market in the various geographies in which the patients served by Plaintiffs reside, Defendants would be able to unilaterally determine the price of PCP care, inevitably increasing the cost of basic healthcare services and thereby reducing access to private care and placing greater strain on the public healthcare system.

73.     As set forth herein, Defendants acted with intent to destroy a competitive marketplace for physicians and physician group practices and monopolize the PCP Market within the various geographies in which the patients served by Plaintiffs reside, through unlawful and anti-competitive means, including: explicit threats to cancel HSAs with the Emanate Hospitals if Plaintiffs did not accede to abusive, coercive, and anti-competitive terms, such as (a) Plaintiffs agreement to exit the PCP Market in these geographies; and (b) provisions proscribing solicitation of Defendants' members, physicians and

employees during and beyond the term of the contract; (c) EHMG and EHIPA's agreement to provide services exclusively to OHPC; and (d)  Plaintiffs' agreement to provide a right of first refusal to Defendants if any PCP practice affiliated with EHMG or EHIPA was up for sale.

74.     When Plaintiffs refused these coercive, anti-competitive terms, Optum took measures to reduce Emanate Health's access to OHPC's Medicare Advantage HMO and Commercial HMO members by cancelling the HSAs.

75.     Defendants took additional anti-competitive measures after the HSAs were cancelled. When the Former Optum Providers terminated their respective relationships with the Optum-Covina clinic and joined EHMG, Defendants directed physicians and employees to withhold from patients of the Former Optum Providers information concerning their departure and new location, and took punitive measures (including termination of employment) against any employee who truthfully responded to patient inquiries regarding the status and location of the Former Optum Providers, to impede patients from finding their physicians and choosing whether to follow them.  In addition, Defendants intentionally and falsely misrepresented the status of certain Former Optum Providers, lying that they were on vacation or retired, rather than telling the truth so the patients could find them.

76.     These anti-competitive acts have injured Plaintiffs and deprived them of the benefits of open competition.  Plaintiffs have experienced a decline in income resulting from the reduction in OHPC referrals for elective procedures. These injuries were a direct and foreseeable result of Defendants' anti-competitive conduct and represent the type of injury the antitrust laws were designed to prevent.

## **FIRST CAUSE OF ACTION**

### **(Sherman Act § 2 – Attempted Monopolization)**

### **(All Plaintiffs Against All Defendants)**

77.     Plaintiffs restate and incorporate the allegations in paragraphs 1-76

24

1  above as if they were set forth in full herein.

2      78.    Establishing attempted monopolization under the Sherman Act

3  requires proof (1) that a defendant has engaged in predatory or anticompetitive

4  conduct with (2) a specific intent to monopolize and (3) a dangerous probability of

5  achieving monopoly power.  It is not necessary to show that success rewarded the

6  attempt to monopolize; rather, when that intent and the consequent dangerous

7  probability exist, the Sherman Act applies against the dangerous probability as

8  well as against the completed result.

9      79.    Specific intent to monopolize means a specific intent to destroy

10  competition or build or maintain monopoly power.  Objective intent manifested by

11  use of prohibited means is sufficient to satisfy the intent component of attempt to

12  monopolize.

13      80.    The dangerous probability inquiry requires consideration of the

14  relevant market and the defendant's ability to lessen or destroy competition in that

15  market.

16      81.    Defendants have engaged in a purposeful scheme that includes

17  various forms of predatory, coercive, exclusionary, and anti-competitive conduct

18  that, when added together, creates a dangerous probability that Defendants will

19  achieve their anticompetitive goals and obtain monopoly power in a market in

20  which they did not already possess such power.

21      82.    Defendants are the largest employer of physicians in the United

22  States with more than 70,000 physicians in the U.S.  Moreover, in the various

23  geographies in which the patients served by Plaintiffs reside, Defendants possess a

24  dominant market share among Medicare Advantage HMO and Commercial HMO

25  members.

26      83.    Defendants used their dominant Medicare Advantage HMO and

27  Commercial HMO market share in the geographies in which Plaintiffs' patients

28  reside to threaten cancellation of the HSAs in the event that Plaintiffs (a) did not

COMPLAINT                                                    Case No. 2:23-cv-09872

1   exit the physician group business in the Medicare Advantage HMO and

2   Commercial HMO market; (b) did not agree to exclusively serve OHPC's

3   Medicare Advantage HMO and Commercial HMO members; and (c) did not give

4   Defendants a right of first refusal to purchase any EHMG of EHIPA PCP practice

5   that was put up for sale.

6        84.    Defendants have acted with specific intent to eliminate Plaintiffs

7   from the PCP Market in the various geographies in which the patients served by

8   Plaintiffs reside.  As set forth herein, Defendants acted with intent to destroy a

9   competitive marketplace for physicians and physician group practices and

10  monopolize the PCP Market within the various geographies in which the patients

11  served by Plaintiffs reside, through unlawful and anti-competitive means,

12  including: explicit threats to cancel HSAs with the Emanate Health-affiliated

13  Hospitals if Plaintiffs did not accede to abusive, coercive, and anti-competitive

14  terms, such as (a) Plaintiffs agreement to exit the PCP Market in these

15  geographies; (b) provisions proscribing solicitation of Defendants' members,

16  physicians and employees during and beyond the term of the contract; (c) EHMG

17  and EHIPA's agreement to provide services exclusively to OHPC; and (d)

18  Plaintiffs' agreement to provide a right of first refusal to Defendants if any PCP

19  practice affiliated with EGMG or EHIPA was up for sale.

20       85.    Defendants' specific intent to eliminate competition in the PCP

21  Market in the various geographies in which the patients served by Plaintiffs reside

22  was memorialized both in the form of Defendants' written communications and

23  proposals concerning renegotiation of the HSAs, as well as in verbal

24  communications from Defendants' representatives on June 30, 2021, December 17,

25  2021, and May 5, 2022 during which Defendants explicitly stated that they viewed

26  the PCP Market in the various geographies in which the patients served by

27  Plaintiffs reside as Defendants' exclusive domain, and that Emanate Health had to

28  "stay in its lane" and focus only on managing hospitals and clinics, not physicians.

86.     Following the coercive and anti-competitive non-renewal of the HSAs, Defendants engaged in a course additional punitive, exclusionary, and anti-competitive acts intended to strangle Plaintiffs' business.  As set forth in detail above, when the Former Optum Providers terminated their respective relationships with the Optum-Covina clinic and joined EHMG, Defendants directed physicians and employees to withhold from patients of the Former Optum Providers information concerning their departure and new location, and took punitive measures (including termination of employment) against any employee who truthfully responded to patient inquiries regarding the status and location of the Former Optum Providers, to impede patients from finding their physicians and choosing whether to follow them (in violation of California and federal Continuity of Care regulations). In addition, Defendants intentionally and falsely misrepresented the status of certain Former Optum Providers, lying that they were on vacation or retired, rather than telling the truth so the patients could find them.

87.     Taken together, Defendants' anticompetitive course of conduct creates a dangerous probability that Defendants will succeed in achieving monopoly power in the PCP Market.  Prior to the coercive and anticompetitive cancellation of the HSAs, Defendants' Medicare Advantage HMO and Commercial HMO members constituted close to and, in some cases, more than fifty percent (50%) all discharges from Emanate Health-affiliated hospitals. Since the cancellation of the HSAs, Defendants have made a concerted effort to avoid referring patients to Emanate Health-affiliated facilities and to refer and transfer them to other facilities—even when doing so violated California and/or federal statutory continuity-of-care requirements—and always as part of the punishment for Plaintiffs not having agreed to stay out of the physician business.  These practices have led to a significant decline in admissions at Emanate Health's affiliated hospitals.

88.     Plaintiffs have experienced loss of income and harm to their

27

reputation due to Defendants' anticompetitive conduct and suffered harm to their businesses. These injuries were a direct and foreseeable consequence of Defendants' anticompetitive course of conduct, as described herein. Further, these actions have deprived Plaintiffs of the benefits of open competition and represent precisely the type of conduct the antitrust laws were designed to protect against. Additional and irreparable injury is threatened if Defendants' ongoing conduct in furtherance of this anticompetitive scheme is not enjoined, threatening to further harm competition in the PCP Market in the geographies served by Plaintiffs. As such, Plaintiffs are entitled to recover threefold the damages sustained, and the cost of suit, including reasonable attorneys' fees pursuant to 15 U.S.C. § 15.

## SECOND CAUSE OF ACTION

### (Unfair Business Practices in Violation of
### Cal. Bus. & Prof. Code § 17200 et seq.)
### (All Plaintiffs Against All Defendants)

89.     Plaintiffs restate and incorporate by reference each of paragraphs 1-76 above as if they were fully set forth herein.

90.     California Business and Professions Code § 17200 prohibits "unfair competition," defined as any "unlawful, unfair or fraudulent business act or practice . . . ."

91.     As set forth herein, Defendants engaged in a pattern of anti-competitive conduct whereby they attempted to use their dominant market share in the market of Medicare Advantage HMO and Commercial HMO members, to force Plaintiffs to exit the PCP Market in the geographies served by Plaintiffs. Then, when Plaintiffs did not bend to Defendants' unlawful demands for to restrict competition for and among physicians, they steered business away from the hospitals and clinics affiliated with Plaintiffs, often to geographically distant locations, such as San Dimas Community Hospital and Arcadia Methodist Hospital. This was a punitive measure linked to Plaintiffs' refusal to submit to

1 Defendants' coercive and anti-competitive terms for the HSAs.

2      92.     Further, as set forth herein, Defendants made false misrepresentations

3 of fact to patients about the status and whereabouts of Former Optum Providers

4 who had terminated their association or employment with Optum.  Among these

5 false misrepresentations were statements to patients asking where their doctors had

6 gone that one or more of them had retired or were on vacation, when in fact they

7 had departed Optum and moved their medical practices to EHMG.

8      93.     In addition, after the Former Optum Providers began joining EHMG

9 in December 2022, Defendants instructed their physicians and staff to conceal

10 from patients where their doctors had gone and threatened to take—and in fact did

11 take—disciplinary action against one or more persons who truthfully responded to

12 patient inquiries regarding the status and whereabouts of one or more Former

13 Optum Providers.

14      94.     Furthermore, upon information and belief, Optum's contracts with its

15 physicians and other medical professionals include broad post-employment non-

16 competition and non-solicitation covenants, which restrain its former employees

17 from working for competing provider networks or health systems, and from

18 soliciting Optum patients and employees.  These anticompetitive post-employment

19 restrictive covenants are void and unenforceable under Business & Professions

20 Code § 16600 and have harmed Defendants by deterring physicians and other

21 medical staff from seeking employment with EHMG, and artificially limiting the

22 number of OHCP members who seek care with Emanate-affiliated physicians.

23      95.     Defendants' actions described herein constitute unfair business

24 practices within the meaning of California Business & Professions Code § 17200.

25 As a result of Defendants' unfair business practices, Plaintiffs have suffered harm

26 and Defendants have been unjustly enriched.  Plaintiffs are entitled to restitution of

27 all monies stemming from medical services provided to patients that were diverted

28 from Plaintiffs' affiliated hospitals and providers, and the disgorgement of all ill-

gotten revenues and profits stemming from Defendants' unfair business practices.

**THIRD CAUSE OF ACTION**

**(Unlawful Business Practices in Violation of**

**Cal. Bus. & Prof. Code § 17200 et seq.)**

**(All Plaintiffs Against All Defendants)**

96.     Plaintiffs restate and incorporate by reference each of paragraphs 1-76 above as if they were fully set forth herein.

97.     As described in detail above, Defendants have engaged in an unlawful course of conduct towards Plaintiffs in violation of federal and California law, including, without limitation, Sherman Act § 2; California regulations governing the Continuity of Care, including California Health & Safety Code § 1373.96(c)(3)(A); 42 CFR § 422.112; Medicare Managed Care Manual Chapter 4, section 110.1.2.1 and California Business & Professions Code 16600.

98.     Defendants' conduct, outlined above, constitutes unlawful business practices in violation of Business & Professions Code § 17200.

99.     As a result of Defendants' unlawful business practices, Plaintiffs have suffered harm and Defendants have been unjustly enriched.  Plaintiffs are entitled to restitution of all monies stemming from medical services provided to patients that were diverted from Plaintiffs' affiliated hospitals and the disgorgement of any ill-gotten gains obtained by Defendants.

**FOURTH CAUSE OF ACTION**

**(Intentional Interference with Prospective Economic Advantage)**

**(EHMG Against All Defendants)**

100.    Plaintiffs restate and incorporate by reference each of paragraphs 1-76 above as if they were fully set forth herein.

101.    As set forth above, the Former Optum Providers are now employees of EHMG.  Prior to moving to EHMG, the Former Optum Providers had a longstanding economic and physician-patient relationship with patients they

treated in the regular course of their medical practice at Optum-Covina (f/k/a Magan).  Given the longstanding nature of many of their patient relationships, the Former Optum Providers had an expectation that many patients would elect to follow them to EHMG to preserve the continuity of care.

102.  Defendants were aware of the longstanding physician-patient relationships the Former Optum Providers had built with their patients in the regular course of their medical practices and had knowledge of the substantial probability that if the Former Optum Providers' patients learned that the Former Optum Providers were moving their practice to EHMG, their patients would follow them.  For this reason, Defendants, through their agents at Optum-Covina, intentionally directed Optum-Covina physicians, medical assistants and staff to engage in a series of anticompetitive, wrongful acts calculated to disrupt the physician-patient relationship between the Former Optum Providers and their patients. These acts included: (a) directing physicians, medical assistants, and other staff not to disclose to patients the resignation or relocation of the Former Optum Providers to EHMG; (b) disciplining and/or terminating those employees who violated this directive; and (c) intentionally making false misrepresentations about the reasons for the Former Optum Providers' absence, including, without limitation, that one physician retired and that another was on "vacation," when in fact they had relocated their practices to EHMG.

103.  Defendants' actions disrupted the relationship between the Former Optum Providers and their patients and directly caused economic harm to EHMG by depriving EHMG of the business of its employees' patients.

104.  Defendants' conduct was authorized or ratified by Defendants' managing agents and was malicious, oppressive, fraudulent, and/or engaged in with reckless disregard for the rights of Plaintiffs.  Accordingly, Plaintiffs are entitled to punitive damages.

COMPLAINT                                          Case No. 2:23-cv-09872

## FIFTH CAUSE OF ACTION

### (Declaratory Relief, 28 U.S.C. § 2201; Cal. Code Civ. P. § 1060)

### (All Plaintiffs Against All Defendants)

105.   Plaintiffs restate and incorporate by reference each of paragraphs 1-76 above as if they were fully set forth herein.

106.   Pursuant to 28 U.S.C. § 2201(a), in an actual case or controversy, "any court of the United States … may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought."

107.   Additionally, section 1060 of the California Code of Civil Procedure permits "[a]ny person interested . . . under a contract . . . in cases of actual controversy relating to the legal rights and duties of the respective parties, [to] bring an original action or cross-complaint . . . for a declaration of is or her rights and duties . . . ."

108.    The non-solicitation covenants alleged above that Defendants put in their contracts with Defendants' PCPs and with Foothill Presbyterian, Queen of the Valley, and EHMG (collectively, the "Non-Solicitation Covenants") are unlawful, void, and unenforceable restraints on trade under Business & Professions Code § 16600.

109.   There is an actual case or controversy involving justiciable questions relating to the rights and obligations of the parties—i.e., whether the Non-Solicitation Covenants are legal and enforceable.

110.   Plaintiffs seek a judicial determination of their rights and obligations with respect to the Non-Solicitation Covenants, which are necessary and appropriate subjects of declaratory relief.

111.   Without the requested relief, Plaintiffs will remain in a position of uncertainty as to permitted interactions with Defendants' physicians who seek positions of employment with Plaintiffs, and patients of current or former

Defendants' physicians that seek treatment with Plaintiffs.

112.    A judicial declaration is necessary and appropriate so that Plaintiffs may ascertain their rights, duties, and future obligations under the Non-Solicitation Covenants.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray for judgment against Defendants, and each of them, as appropriate to each cause of action alleged, as follows:

1.   For damages according to proof at trial;

2.   For restitution of all moneys unlawfully, unfairly, or unjustly obtained by Defendants, and each of them, as a result of their unlawful or unfair business practices in violation of California Business & Professions Code §16600 and other statutes alleged herein;

3.   For an injunction enjoining Defendants from engaging in the unfair, unlawful, and otherwise wrongful anticompetitive conduct alleged herein;

4.   For a declaration that the Non-Solicitation Covenants are unlawful, void, and unenforceable;

5.   For treble damages and attorneys' fees pursuant to the Clayton Act, 15 U.S.C. § 15;

6.   For costs of suit;

7.   For pre- and post-judgment interest at the applicable legal rate of interest;

8.   For injunctive relief and such other equitable relief permitted by law and in equity; and

9.   For such other, further relief as the Court may deem just and proper.

COMPLAINT                                          Case No. 2:23-cv-09872

Dated:  November 20, 2023          KING & SPALDING LLP


                                  */s/ Glenn Solomon*
                                     GLENN SOLOMON


                                  Attorneys for Plaintiffs
                                  EMANATE HEALTH; EMANATE
                                  HEALTH IPA; EMANATE
                                  HEALTH MEDICAL GROUP;
                                  EMANATE HEALTH FOOTHILL
                                  PRESBYTERIAN HOSPITAL;
                                  EMANATE HEALTH MEDICAL
                                  CENTER d/b/a EMANATE
                                  HEALTH QUEEN OF THE
                                  VALLEY HOSPITAL and d/b/a
                                  EMANATE HEALTH INTER-
                                  COMMUNITY HOSPITAL

COMPLAINT                                    Case No. 2:23-cv-09872

1

## **DEMAND FOR JURY TRIAL**

2

Plaintiffs hereby demand a trial by jury on all claims and issues so triable.

3

4

Dated:  November 20, 2023                                KING & SPALDING LLP

5

6

7                                                                              */s/ Glenn Solomon*

8                                                                                GLENN SOLOMON

9

10                                                                             Attorneys for Plaintiffs

11                                                                             EMANATE HEALTH; EMANATE
HEALTH IPA; EMANATE

12                                                                             HEALTH MEDICAL GROUP;
EMANATE HEALTH FOOTHILL

13                                                                             PRESBYTERIAN HOSPITAL;
EMANATE HEALTH MEDICAL

14                                                                             CENTER d/b/a EMANATE
HEALTH QUEEN OF THE

15                                                                             VALLEY HOSPITAL and d/b/a
EMANATE HEALTH INTER-

16                                                                             COMMUNITY HOSPITAL

17

18

19

20

21

22

23

24

25

26

27

28

COMPLAINT                                                                      Case No. 2:23-cv-09872